Good morning. Alexander Schmidt for the Plaintiffs' Appellants. The factual setting here is not really disputed. Over the last 20 years, there's been a radical transformation in consumers' ability to enforce their rights in this country. It's a change that's impacted virtually every American. Because of the proliferation of adhesion consumer arbitration contracts, in a variety of industries, consumers can no longer go to court. They are forced into arbitration. Are you asking us to revisit the Supreme Court's decision in Concepcion and tell them in hindsight they were wrong? No, not at all. Those decisions were all pure statutory analysis cases. They weren't asked to look at the constitutional implications of what they were doing, and they didn't look at the constitutional implications of what they were doing. But where's the state action here? I guess that's the problem I'm having with your theory. Well, we don't see how there could not be state action here because of what has happened. But AT&T has to be a state actor under your theory, or you lose. Well, under one of our theories, they have to be a state actor. That's under the encouragement test, which is one of the traditional tests. How is AT&T any different from any other entity that benefits from a statute that is enacted that in this case permits it to negotiate it as a provision of the contract, an arbitration provision? It's a very different setting than the cases on which the district court relied below and AT&T relies upon. Here you've had a proliferation of adhesion arbitration clauses. Now, why did that happen? It didn't happen. But how does, I mean, we get adhesion clauses all the time from companies all the time. We don't have to like them, but that doesn't make state action. That's right, but most adhesion clauses don't implicate the First Amendment. They don't violate people's First Amendment rights. What we have here is a wholesale. We see adhesion contracts every month in this court, and the core of it is you're going off to arbitration and you can't go to court. I mean, they're all over the place. That's correct. And you're saying every company that insists upon an adhesion contract that has a clause in it that says you're going to arbitration violates the First Amendment? We're not saying that the contracts do. What we're saying is that because the state That they are engaged in state action as a private company because they insist on the adhesion contract that says you must arbitrate, that's state action? Our claim is not that the private companies are state actors. In fact, if we have to prove that they're state actors, then there's no way that we can actually challenge the FAA on a constitutional basis. What the lower court's decision did here was immunize the FAA from any kind of constitutional scrutiny by the courts, and that's really one of the major problems we have with what the district court did. The reason you have state action here is because it was the state that changed the law dramatically that enabled private parties like AT&T to privately censor and infringe people's ability to go to court. How did the state do that? The state did that through its interpretation of the FAA. Historically, arbitration The Supreme Court's interpretation, not the state. Well, I'm using the state as a capital letter. It's the state, the government, the power of the state. Okay. So what the Supreme Court did, first of all, the FAA was enacted in 1925. Before it was enacted, arbitration clauses were not specifically enforced at all. Okay. So the FAA changed the law to make them enforceable as against large merchants. For 50 years, the FAA was not applied to adhesion contracts. Then beginning around 20 years ago, the Supreme Court started interpreting the FAA as applicable to adhesion contracts. And what that resulted in was in the proliferation of these adhesion clauses. So you have the state empowering private parties to effectuate private deprivations of the first fundamental First Amendment right to go to court. But there's nothing in the act. How can that not be state action? There's nothing in the act that says that AT&T is required to include an arbitration provision in its private contract, is there? That's right. It just says that if they do, then we're going to elevate, the Supreme Court has said, we elevate arbitration alternative dispute resolution to the same field that other forms of dispute resolution occupy. So where's the coercion here? Where's the compulsive element? The compulsive element stems from the fact that the government could not require AT&T to deprive people of the rights to go to court. I mean, that would be coercive. Everyone agrees that that would be coercive. If Congress wrote a statute that said AT&T's customers can't sue AT&T in court, that would be a direct infringement of the petition clause. So in essence, effectively what has happened here is that the Supreme Court, the government, has said to AT&T, look, we can't require your customers not to sue you in court. But if you go ahead and do it, we'll permit you to do it. And if you prevent your customers from going into court, then we'll use the power of the judicial machinery of the State to enforce those contracts. So rather than doing and depriving AT&T's customers of the rights to go to court, is it your position that every time a court rules in favor of a private party to enforce a contractual provision, that constitutes State action? No, not at all. We're saying in this particular context. That's what you just said. No, what we're saying is that the State cannot deprive consumers of their right to go to court. That's a given. Well, how does that establish a level playing field if, in essence, you are challenging Concepcion. You want a scale where trials are at a higher elevation than dispute resolution through arbitration. Well, that's because the Petition Clause guarantees consumers a right to go to court, to a government court. Arbitration is before private arbitrators. There are fundamental First Amendment interests that are unique to litigation and going to court that just aren't vindicated in the arbitration context. And the Supreme Court has discussed this in Bill Johnson's restaurants and B, E, and K contracting. The public available forum in a court to air disputes, to advocate ideas, public courts enable the law to evolve through stare decisis effect. You don't have any of those benefits. None of those First Amendment rights are vindicated in arbitration. It's a confidential proceeding. There's no evolution of the law because arbitration rulings are not subject to stare decisis. And there's no public forum for people to advocate their ideas. If you look at those two cases, the Bill Johnson's restaurant case and the B, E, and K construction case, the court talks at great length about why the  Supreme Court has done is permit AT&T to prevent consumers from going to court. It didn't rise to the level of state action. And as I said, AT&T cannot be a state actor because it's just drafts, private arbitration costs. So the FAA is effectively immunized from any kind of challenge. And if you look at Judge Wald's opinion in dissenting to the en banc decision in the Denver area case, she said it doesn't necessarily follow if you're challenging, directly challenging the constitutionality of a statute, which is what we're doing. It doesn't matter if the private entity that effectuates the private censorship is a state actor or not. You need an avenue to challenge the constitutionality of any statute that has the impact, directly or indirectly, of violating people's First Amendment rights. If you can't challenge it, what you're going to wind up doing is giving rise to a violation of constitutional laws. Anytime a state legislature or Congress knows it can't do something because it's prescribed by the Constitution, for example, an example we provide in the brief, is gun control. Congress knows it can't say you can't carry guns on city streets. That would be a direct violation. So if a state wanted to effectuate a pervasive gun control regime, all it would have to do under the district court's analysis is say, well, okay, let's permit private store owners, private businesses to hire security personnel to confiscate guns within 100 feet of the stores. And then you could effectively have Main Street cleared of guns indirectly without gun owners giving them any ability to challenge the constitutionality of that statute. So, I mean, it creates a rash of problems. But there's another problem with the district court's approach. The Denver area case itself is right on point. What portion of it? The state action ruling. I mean, as I see it, you've got a plurality Supreme Court opinion. So what do I do with that? I mean, which part of it do you want me to follow? It's actually not just the plurality opinion. If you read Justice Kennedy's concurrence, which was joined by Justice Ginsburg, Justice Kennedy is saying what the plurality, the four-member plurality ruled. So you really have a six-justice majority rationale for what state action is. And what he said was that, of course, what the en banc majority panel found, which was precisely the same thing that the district court here found, that mere permission is not enough to be state action, the Supreme Court unanimously rejected the very analysis that the district court employed here. And what the majority rationale on state action was, was that if the state steps in and issues a permissive statute that alters the legal relationships, the existing legal relationships amongst the parties, that's state action. And that's precisely what happened here. The Supreme Court has altered the legal relationships between consumers. Counsel, does it make a difference in the Denver area that we were talking about a resource, public television broadcast bands, that is heavily regulated, and in that case public television channels had been reserved and Denver area challenged the cable owner's judgment as to what the content would be of programming shown on a public television channel? We don't think it makes a difference. The material facts are identical to our case. The fact that there was a government involvement or entanglement was not really a core part of the state action analysis at all. It essentially amounts to censorship, does it not, under the First Amendment? That's exactly right. And by a private actor, the cable television channel owner, and I'm trying to see the analogy here to the facts. Well, what happened there was that the private cable operators were given permission by Congress to do something that Congress itself couldn't do. Congress knows and knew it could not censor the programmers. So it gave permission to the operators to censor the programmers. What happened in our situation is that Congress, the Supreme Court, knows it cannot kick people out of court. So it gave AT&T and other companies the right to kick people out of court and said, if you do that, we'll enforce it in our courts. We'll use the coercive power of the judicial machinery to enforce your private censorship of people's right to go to court. It's entirely parallel circumstances with Denver area. I was just going to say, Congress, we're courts of limited jurisdiction. Congress tomorrow could say that the Article III courts cannot hear cases involving arbitration clauses enacted in a statute, and we would be out of that business. Well, that's correct. Where does that get you? Congress can do it, but the Supreme Court's interpretation of what Congress can do cannot? Well, the Supreme Court's interpretation of a congressional act is always going to be applied retroactively as if the 1925 Congress intended this result. But I guess the core of what we're getting at is that Congress cannot remove the discretion of a co-equal branch of government to consider petitions. Congress could not tell the President you can't hear petitions from AT&T's customers. Congress couldn't tell the President you can hear the petitions, but you can't rule on them. You've got to send them to a private arbitrator, and then you have to defer to the private arbitrator's decisions. Likewise, Congress can't tell the judiciary, the co-equal branch, you don't have discretion. You can't exercise your discretion to hear this petition. You've got to send it to a third party. What's the difference between saying you can't entertain discretion and saying you can't entertain the case? There's no difference. Both of them equally abrogate individuals' rights to go to court just as effectively. And one is a direct restraint. One is an indirect restraint. Sotomayor's tomorrow could tell the Article III courts they cannot hear civil rights cases. That's correct. Completely within their power. That is correct. But that's not what Congress is doing here. Congress is saying don't give that away, because if Congress says in the Federal Court that you cannot hear civil rights cases, the State courts have to be open, provided that there is a constitutional access to court. That's correct. So don't give that one away. You might lose anyway, but don't give away that argument. Thank you, Your Honor. And that's right. I mean, most of these limitations, Justice, Your Honor is raising, and AT&T is raising, are not limitations that prevent people from going into court ab initio and saying you have to go to a private dispute resolution instead of a government court. These are restrictions that allow people to go to different government courts. So it's not the same thing. Now, the final point I want to make is that if this isn't encouragement, what the Supreme Court has done, what is? The district court below felt that there wasn't enough examples of what effective or sufficient encouragement is. And we think that this is very close to what happened in the Skinner case, where the Federal agency decided that it would like to go to the court. How can there be encouragement if the Act gives the private parties the discretion but does not mandate arbitration as a dispute resolution? Because the encouragement here was very successful. Here, because they gave permission to do what they couldn't require them to do. That may be because the parties, at least AT&T, wanted to exercise its discretion under the Act in order to provide for arbitration as a dispute resolution. But it didn't have that discretion before. The government, through the Supreme Court's interpretation of the FAA, really effectively gave You're suggesting before 1925, parties, I don't even know if there was arbitration before 1925, but you're suggesting parties would not have been free to negotiate a contract that included arbitration? The historical record is very clear. The courts would not enforce, specifically enforce, arbitration agreements before 1925. And the record is equally clear that for the first 50 years of the FAA, adhesion contracts against consumers were not being enforced. Even recently, the Supreme Court noticed, and the Mortenson case describes this, that in 50 percent of the cases, consumers were avoiding adhesion arbitration clauses. And then, as the Ninth Circuit said in Mortenson, the Supreme Court was motivated to step in and stop it. If that's not encouragement, and it succeeded in stopping it, if that's not encouragement, then we think nothing is. And I have two minutes left I'd like to reserve. Thank you. Thank you, Your Honor. May it please the Court. Andrew Pincus for AT&T Mobility. I'd like to start, if I might, with the State Action Doctrine issue. And just to set the stage for the breadth of the argument that's being advanced on the other side, I think it's important to step away for a minute from arbitration and think about confidentiality agreements, which are routine in business, both businesses with their employees, negotiators with potential counterparties, trade secrets, lots of confidentiality agreements. I think the theory here would mean that the substantive restrictions on speech imposed by all of those agreements would be measured by the First Amendment's strict scrutiny standard. And I think that illustrates the problem with the approach that's being advocated. The Supreme Court, in the Lugar case, sort of explained the limit that the State Action Doctrine tries to draw by pointing out that it's otherwise private parties would face constitutional litigation whenever they seek to rely on a State statute governing their interactions with the communities surrounding them. And this Court said something similar that we quote in our brief in the Ono case. So the question here really is, is what is that dividing line? And what the Supreme Court has really said is in the contractual situation, you don't look at the underlying agreement is not measured by constitutional constraints. Obviously, there are lots of constraints on what courts can do and in the possible enforcement of that agreement, but the underlying agreement itself couldn't be subject to constitutional constraints because that would mean that that very private ordering that the contracts are designed to do would be subject to the constitutional constraints. Now, there is a case that's been recognized in the Flagg brothers case and in the particularly in the American manufacturing case, which I think is very much on point. Just to talk about it for a minute, that's a case that involved a statute provision in the workman's compensation process that said that the workman's compensation insurer could withhold payments if there was some dispute about the legitimacy of the service. And that was challenged on procedural due process grounds. And very similar to this case, the challenge was asserted on a facial basis. The argument is this is facial. We're challenging the statute itself, so we're not this is not really about the private actor, the insurer withholding the money. This is a challenge to the facial statute that was enacted by the, in that case, by the Pennsylvania legislature. And the Supreme Court said, no, we're not going to look at the case that way. We're going to look at what's really going on here, and that this ---- You know, there's an old Supreme Court case dealing with racially restrictive real estate covenants in which the Court holds that the enforcement of those covenants is State action. How do you get away from that case? It does, Your Honor, Shelley v. Kramer. And this Court addressed that case in the Ono case, Judge Berzon speaking for the ---- which was another case about the question of judicial enforcement and underlying agreements. And what Judge Berzon said in that case is, and it's been recognized by other authorities, that that really is a unique rule for racially discriminatory covenants. And the Court expressly declined to extend it beyond that because the argument was being made at Ono that that was a justification for looking at the substance of the legal regime, of the legal obligation that the Court was enforcing. In that case, it was a Japanese judgment, sought to be enforced in the U.S. I have to say, I read Shelley v. Kramer as the Supreme Court really hated racially restrictive covenants, so it reached out to find State action. Unfortunately, for the other side, the United States Supreme Court loves arbitration. Therefore, it's not going to reach out. Well, and I think even in context other than arbitration, like the Ono case that I was referring to, courts have said that Shelley really is restricted, as you say, exactly right, to something that was so obnoxious that the Court really reached out to find a way to get at it, but that decision really subsequently has been confined to its facts. And so in American manufacturing, the Court said, yes, there's a statute here, but what that statute does is leave room for private action, the withholding of the money, and that isn't State action, and therefore, there's no challenge that can be brought, even though it's being framed as a challenge to the terms of the statute. And I think the Lugar decision also talks about Flag Brothers, which, as you know, was a question about the enforced sale by a Bailey permitted under New York law. There the New York law, the Uniform Commercial Code, gave the Bailey the permission to sell the authority to sell the goods. The owner of the goods went into court and said, this violates due process. I want to challenge the statute, and Flag Brothers said, no, that's private action. You're trying to get an injunction against a private person, and exercising the rights for the power that conferred to him or her under the statute, there is no State action here. And the Court says, in Lugar, describing Flag, undoubtedly, the State was responsible for the statute. The court the response of the court focused not on the terms of the statute, but on the character of the defendant. Action by a private party pursuant to this statute without something more was not sufficient to lead to a characterization of a State actor. And I think that's our submission is that's exactly what the situation is here. Turning to the Denver area case, let me just mention the gun control example that my friend raised. There's nothing that gives, to the extent a State law gave a store owner the power to deputize private marshals and have them go out into the That would clearly be State action, because the State would have given its power. The only way those private people could be subjecting passersby on the city streets to some no-gun rule would be because they were exercising government power. And obviously, conferring government power on a State actor is State action, on a private actor does make that State action, but that's not what's happening here. This is about contractual agreements, private agreements. The Denver area case, as Judge Tolman said, it's a little bit of a gestalt. The Justice Breyer's opinion for the plurality, I think it's clear that the sentence that my friend relies on is a description of the lower court. It's not a holding that every statute can be challenged on State action grounds, because that's the very argument that several years later the Court rejected in American manufacturing. It seems to us that it's best analyzed on the ground that, as Justice Breyer describes the Petitioner's argument, this is an industry that was very entangled with the government, used the public rights of way, reliant on government authorizations. This is a situation where the government had targeted a particular, had prohibited censorship broadly, and then gave back in a specific area. So it's a very different situation than the situation that we have here. Turning to the encouragement test, it's a pretty tough test to meet. The Supreme Court in Blum said the encouragement has to be so significant that the actor in law is that of the State, so mere encouragement and approval are not enough. In American manufacturing, for example, that statute created, gave the insurance company the right to withhold the money and was structured in a way that encouraged that, because that was a way to double-check against fraudulent services. And the Court said that fact was not enough to find encouragement. The Skinner case that was referred to was a case about drug testing by railroads. And in that case, the Court specifically addressed this question of encouragement and why it found encouragement and relied on a couple of factors that aren't present here. First of all, the regulations permitting drug testing superseded any contrary provision in collecting bargaining agent agreement. They gave the Federal Government the right to receive any drug test that was taken, so the Federal Government was sort of in the drug test process, and it barred the railroads from divesting themselves by contract or otherwise of those rights. So what the Court said, those that combination of factors, none of which are present here, created the sufficient encouragement and really turned the railroad's decision into that of the State by basically saying you can't decide not to do this in any kind of contractual way, and if you do it, you have to give us the results, clearly making the government very, very involved in that decision in a way that the government is not involved in the decision here. Turning so unless the Court has any questions on State action, I turn briefly to the Petition Clause question. And as we raise in our brief, an alternative ground for the Court to address this issue would be to say that even if there were State action, that there's no Petition Clause violation here, and we think the clearest reason for that is that the Petition Clause provides only a right to present a petition. It doesn't confer any right to have that petition decided on the merits addressed. It doesn't even give you a response, a right to a response to the petition. The Supreme Court has said that in the Smith case, in the Minnesota College case, and I think Judge Garland's analysis for the D.C. Circuit in the American Bus case is very much on point here, where there had been an administrative process for enforcing some rules applicable to interstate buses. That process gave injured parties a right to complaints, a right to get advisory opinions, a right to get orders. There was a problem with transportation to Seattle baseball games, and so Senator Murray added a rider to an appropriations bill, saying there will be no remedy, there will be no action by this administrative body with respect to, and then named a few characteristics that singled out this company that was providing charter service to Mariners games. And the D.C. Circuit, faced with the Petition Clause challenge, said all the Petition Clause gives you a right to do is petition. You can still file your complaint with this body. True, they can't decide it, but you can file it and you can still go to Congress and complain about the fact that this restriction has been put on this body, and that's really all that the Petition Clause gives you in terms of relief. The reason is clear, as Judge Hawkins said. Otherwise, the Petition Clause would be a check on every limitation on court jurisdiction. Every statute of limitations question, everything to do with court procedure would have to be looked at through the lens of the Petition Clause, because all of those things conceivably could be argued by someone to be limitations on the ability to get a court decision if there was a right to do so. Unless the Court has any further questions, I'd rest there. Roberts. I do. Thank you. Thank you. Quickly, on the Sullivan case, American Manufacturers, very factually different. There, it was a Section 1983 case where the gravamen of the complaint was seeking damages. And also, it was just a little tweak of a Pennsylvania statute that gave Pennsylvania insurers the ability to defer paying certain claims. It wasn't the radical transformation of arbitration law that we're talking about here. It's entirely different. On the merits of the Petition Clause, again, the right to present a petition is one aspect of the Petition Clause right to go to court. But the text of the Petition Clause is very clear. It says you have a right to seek redress, to ask a court for a redress of grievances. Well, no. And redress means remedy. It says you have the right to petition the government for redress of grievances. That's correct. It doesn't say that the government has to redress them. It simply says you have the right to raise them. That's correct. But that's been interpreted in the Sosa case in the Ninth Circuit as meaning meaningful access. That's been interpreted in the California transport case, motor transport case of the Supreme Court, as being a right to be heard. But again, the central point is, is that the government can't take away judges' discretion to hear a petition. If the judiciary wants to hear a petition, sure, it's got theoretical discretion. The Supreme Court, the only court the Article III talks about, has in civil cases absolute discretion as to whether to hear cases. But Congress cannot tell the Supreme Court you can't exercise that discretion in favor of hearing a case. And that's really the fundamental difference here. As far as the Judge Garland decision, again, very different facts. The end result there was that Congress gave a remedy and Congress took it away. It's not Congress telling the judiciary that they can't hear petitions from consumers. Thank you. Thank you. Thank you very much. Thank you, both counsel. Roberts v. AT&T and Mobility, now submitted for decision. That completes our calendar for this morning. We know that there are some students here. While we're doing conference, some of our law clerks will talk to the students, and then following conference, we'll come out and talk to the students.
judges: Hawkins, W. Fletcher, Tallman